**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                  Plaintiff,<br><br>*ex rel*. [UNDER SEAL],<br><br>                  Relator,<br><br>                  v.<br><br>[UNDER SEAL]<br><br>                  Defendants. | CA No. _____*SEALED*<br><br><br>**COMPLAINT**<br>**(Jury Trial Demanded)** |

# FILED *IN CAMERA* AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) (Exempt from ECF)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | CA No. *SEALED* |
| *ex rel*. Ashley Westover and Jessica Tollison., | |
| Relator, | |
| v. | **COMPLAINT**<br>**(Jury Trial Demanded)** |
| Katherine Davis; Phillip Morderer; John Doe #1, a/k/a Seth Jackson; Remote Solutions, LLC; Quality of Life DME Group, Inc., First Due Medical, LLC, and John Doe DME Companies, | |
| Defendants. | |

## <u>INTRODUCTION</u>

Relators, Ashley Westover and Jessica Tollison (collectively "Relators"), bring this Complaint on behalf of themselves and the United States of America pursuant to the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA"), against Defendants: Katherine Davis, Phillip Morderer, John Doe #1, a/k/a Seth Jackson, Remote Solutions, LLC, Quality of Life DME Group, First Due Medical LLC, and John Doe DME Companies yet to be identified (together **"Defendants"**) to recover damages and civil penalties arising from an unlawful kickback scheme in violation of the Federal, Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320-7b . This conduct resulted in the submission of kickback-tainted claims for payment to federal health insurance programs in violation of federal law. Relators would respectfully show the Court as follows:

## SUBJECT MATTER JURISDICTION AND VENUE

1.     This action arises under the FCA and the AKS. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1345 and 31 U.S.C. §§ 3730(b) & 3732(a).

2.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because at least one Defendant transacts business in this District and numerous acts prohibited by federal law occurred in this District.

3.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a).

2.     Relators' claims and this Complaint are not based upon the prior public disclosure of allegations or transactions in a criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation; or from news media, as enumerated by 31 U.S.C. § 3730(e)(4)(A). To the extent there has been a public disclosure unknown to Relators, Realtor Westover and Relator Tollison are an "original source," and the public disclosure is a result of Relators voluntarily providing this information to the United States prior to filing this *qui tam* action. *See* 31 U.S.C. § 3730(e)(4)(B).

## THE PARTIES AND PERSONAL JURISDICTION

4.     Relator Westover is resident of Greenville, South Carolina. Relator Westover is a former employee of Remote Solutions, LLC, wherein she was a manager and oversaw a portion of the call center operation discussed, *infra*.

5.     Relator Tollison is a resident of Easley, South Carolina. She is an accountant for Table 301, a restaurant group operating in Greenville, South Carolina. At all times relevant to this complaint, Relator Tollison worked in the same building as Remote Solutions, LLC, wherein

she obtained information from employees of Remote Solutions, LLC related to the call center operation discussed, *infra.*

6.      Remote Solutions, LLC ("Remote Solutions") is a limited liability company organized under the laws of the State of Wyoming. Upon information and belief, Remote Solutions, LLC began active operations in South Carolina sometime in or around June 2020. Its registered agent is Capital Administrators LLC, which is located at 1712 Pioneer Avenue, Suite 747, Cheyenne, Wyoming, 82001, and its Greenville office was located at 135 South Main Street, Greenville, South Carolina, 29601.

7.      Defendant John Doe a/k/a Seth Jackson, upon information and belief, controls operations associated with Remote Solutions, and is the boss of Defendants Phillip Morderer and Katherine Davis. The true identity of Defendant Jackson was concealed from Relator Westover while she was employed with Remote Solutions. On information and belief, Defendant Jackson is a resident of Florida.

8.      Defendant Katherine Davis was the boss of Relator Westover at Remote Solutions. Upon information and belief, Defendant Davis is a resident of Florida.

9.      Defendant Phillip Morderer was the boss of Relator Westover at Remote Solutions. Upon information and belief, Defendant Morderer is a resident of Florida.

10.     Quality of Life DME Group, Inc. ("Quality of Life") is a DME company organized under the laws of the State of Florida with an operating address of 500 NE Spanish Boulevard, Boca Raton, Florida. Upon information and belief, Quality of Life paid kickbacks to Remote Solutions for referrals and submitted claims based upon these referrals to the federal government for payment.

11.     First Due Medical Inc. ("First Due") is a DME company organized under the

laws of the State of Florida with a principal address of 111 N 2nd Street, Suite 104, Fort Pierce, Florida 34950. Upon information and belief, First Due paid kickbacks to Remote Solutions for referrals and submitted claims based upon these referrals to the federal government for payment.

12.      John Doe DME Companies are, upon information and belief, certain DME companies operating throughout the United States that illegally paid kickbacks to Remote Solutions and related entities for Medicare DME referrals.

## BACKGROUND ON FEDERAL HEALTH INSURANCE PROGRAMS

13.      In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare Program to provide health insurance for the elderly and disabled. Medicare is a health insurance program for: people age 65 or older; people under age 65 with certain disabilities; and people of all ages with end-stage renal disease (permanent kidney failure requiring dialysis or a kidney transplant).

14.      Medicare now has three parts: Part A, Part B, and Part D Programs.

15.      Medicare Part A (Hospital Insurance) helps cover inpatient care in hospitals, including critical access hospitals, and skilled nursing facilities (not custodial or long-term care). Medicare Part A also helps cover hospice care and some home health care.

16.      Medicare Part B (Medical Insurance) helps cover doctors' services and outpatient care, as well as, other medical services not covered by Part A including DME equipment and supplies.  Part B also helps pay for covered health services and supplies when they are medically necessary.

17.      Medicare Part D (Prescription Drug Plan) provides beneficiaries with assistance in paying for outpatient prescription drugs.

18.     Payments from the Medicare Program come from a trust fund - known as the Medicare Trust Fund - which is funded through payroll deductions taken from the work force, in addition to government contributions. Over the last forty years, the Medicare Program has enabled the elderly and disabled to obtain necessary medical services from medical providers throughout the United States.

19.     The Medicare Program is administered through the United States Department of Health and Human Services ("HHS") and, specifically, the Centers for Medicare and Medicaid Services ("CMS"), an agency of HHS.

## THE FALSE CLAIMS ACT AND THE ANTI-KICKBACK STATUTE

20.     The False Claims Act (FCA) provides, in relevant part, that:

any person who--(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; […]

* * *

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-4101), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 .S.C. § 3729(a)(1).

21.     The FCA also provides relief from retaliatory actions by defendants, and provides in relevant part, that:

Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is

discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 .S.C. § 3729(a)(1).

22.     The federal Anti-Kickback Statute (AKS), 42 U.S.C. § 1320-7b, makes it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce the referral of business reimbursable under a federal health benefits program.

23.     "Any remuneration" means any kickback, bribe, or rebate, direct or indirect, overt or covert, cash or in kind. 42 U.S.C. § 1320a-7b(b)(1).

24.     AKS violations are a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both, and exclusion from federal health care programs for at least five years. See id. § 1320a-7b. In addition to the statute's criminal penalties, the HHS Secretary has power to impose administrative penalties including exclusion and sanctions of $10,000 per kickback violation. Id. § 1320a-7a.

25.     The statute's prohibition against knowing and willful conduct in disregard of the law extends to any arrangement where one purpose of the remuneration is to induce referrals. *United States ex rel. Westmoreland v. Amgen, Inc.*, 812 F. Supp. 2d 39, 47 (D. Mass. 2011) (collecting cases).

26.     Proof of an explicit quid pro quo is not required to show a violation of the Anti-Kickback Statute.

27.     In addition to criminal penalties, a violation of the Anti-Kickback Statute can also subject the perpetrator to exclusion from participation in federal health care programs (42 U.S.C. § 1320a-7(b)(7)), civil monetary penalties of $50,000 per violation (42 U.S.C. § 1320a-7a(a)(7)), and three times the amount of remuneration paid, regardless of whether any part of the remuneration is for a legitimate purpose. 42 U.S.C. § 1320a-7a(a).

28.     HHS has published safe harbor regulations that define practices that are not subject to prosecution or sanctions under the federal Anti-Kickback Statute because such practices would unlikely result in fraud or abuse. See 42 C.F.R. § 1001.952. However, only those arrangements that precisely meet all of the conditions set forth in the safe harbor are afforded safe harbor protection. None of the practices at issue here meet these safe harbor regulations.

29.     Compliance with the Anti-Kickback Statute is a condition of payment under the Medicare and Medicaid programs, and that condition applies regardless of which entity is submitting the claim to the government.

30.     Claims that arise from a kickback scheme violate the FCA for two separate and distinct reasons: (1) claims seeking payment for services or prescriptions tainted by kickbacks are "factually false" because compliance with the Anti-Kickback Statute is a condition of payment; and (2) health care providers must certify in their provider enrollment agreement that they will comply with the Anti-Kickback Statute as a condition of payment.

31.     Claims that result from a kickback scheme are per se false because the Anti-Kickback Statute prohibits the government from paying for services or pharmaceuticals tainted by

kickbacks. No further express or implied false statement is required to render such infected claims false, and none can render the claim legitimate.

32.    The False Claims Act imposes liability where a defendant knowingly causes such tainted claims to be presented to the Medicare, Medicaid, or other government funded healthcare programs.

33.    Second, as a prerequisite to participating in federally-funded health care programs, providers must certify (expressly or, through their participation in a federally-funded health care program, impliedly) their compliance with the federal Anti-Kickback Statute.

34.    DME companies, physicians, hospitals, and pharmacies enter into Provider Agreements with CMS in order to establish their eligibility to seek reimbursement from the Medicare Program. As part of that agreement, without which HME companies, physicians, hospitals and pharmacies may not seek reimbursement from Federal Health Care Programs, the provider must sign the following certification:

> I agree to abide by the Medicare laws, regulations and program, instructions that apply to [me]. The Medicare laws, regulations, and program instructions are available through the [Medicare] contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare.

Form CMS-855-S (for Durable Medical Equipment, Prosthetics, Orthotics and Supplies (DMEPOS) Suppliers)

35.    Even in the absence of an express certification of Compliance, a party that submits

a claim for payment impliedly certifies compliance with all conditions of payment, i.e., that it is properly payable.

36.    On March 23, 2010, as part of the Affordable Healthcare for America Act, the Anti-Kickback Statute was amended to clarify that all claims resulting from a violation of the Anti-Kickback Statute are a violation of the federal False Claims Act. 42 U.S.C. § 1320a-7(b)(g). The amendment to the Anti-Kickback Statute codified the long-standing law within the Federal Circuit Courts of Appeals that a violation of the Anti-Kickback Statute renders a claim false under the federal False Claims Act. *See e.g*., *United States ex rel. Schmidt v. Zimmer, Inc*., 386 F.3d 23 (3d Cir. 2004).

## FACTUAL ALLEGATIONS CONCERNING DEFENDANTS' CONDUCT

37.    Remote Solutions operated a call center dealing exclusively with Medicare DME leads, located in Greenville, South Carolina.

38.    The purpose of the call center was to contact potential Medicare patients; confirm they had valid Medicare coverage; screen them for possible DME braces; send them to a tele-doctor; and on information and belief, sell the ultimate Medicare DME referral (including prescription) to DME companies.

39.    Relator Westover worked as a sales manager for Remote Solutions beginning in or around August 2020 until November 2020, when she was fired for raising concerns regarding the legality of Remote Solutions' business practices.

40.    Remote Solutions' day-to-day operations were overseen by Defendants, Katherine Davis and Phillip Morderer.

41.    On information and belief, Defendants Davis and Morderer reported to an unknown individual, who was referred to by Defendants Davis and Morderer as Seth Jackson,

and identified in this complaint as Defendant Jackson.

42.    The name Seth Jackson was used as an alias to, on information and belief, hide Defendant Jackson's true identity from employees.

43.     In conversations with Relator Westover, Defendants Davis and Morderer referred to Seth Jackson as the individual who was "paying the bills."

44.    The call center operated in the following manner:

a.    Sales employees, such as Relator Westover, were provided with an auto dialer that dialed numbers of potential Medicare beneficiaries.

b.    Remote Solutions referred to the numbers as "leads," and Defendants Davis and Morderer complained of the costs of these leads.

c.    Each sales representative would follow "scripts" of what to say to the potential Medicare beneficiaries on the call.

d.    Sales representatives were instructed that the goal of the calls was to identify whether the individual was a Medicare beneficiary; obtain their Medicare Identification number; and collect certain information that would then be passed on to Morderer and Davis.

e.    At the outset of the call, sales representatives were instructed to gather the patients' Medicare ID number and information.

f.    The sales representative would then put this information into a Cortex EDI[1] software. This software would then send back to the sales representative information regarding the Medicare eligibility of that potential patient.

_____

[1] Cortex EDI is a Medicare eligibility software. *See https://apps.cortexedi.com/EligInfo.aspx* (last visited February 9, 2021).

g.     The following is an example of the information the sales representative would

        receive from the software:



h.     After receiving the information from Cortex, the sales representative would

        then forward the eligibility information to Defendant Morderer or Defendant

        Davis through Slack, a chat application.

i.      Defendant Morderer or Davis would then respond to the sales representative

        with information regarding what braces the Medicare beneficiary could

        receive.

j.     The following is an example of Defendant Morderer responding with brace

        eligibility under the chat handle of James St. Patrick:[3]

---

[2] The NPI number identified in this screenshot (1962976183) is associated with First Due. *See https://npidb.org/organizations/suppliers/durable-medical-equipment-medical-supplies_332b00000x/1962976183.aspx?src=2* (last visited February 9, 2021).

[3] It was common place at Remote Solutions for individuals to use different names in the Slack chat application.



k.    After receiving information regarding the types of braces a patient was eligible for, the sales representatives were then instructed to obtain other information to include what braces the patient was interested in.

l.    This information was inputted by the sales representative into a Formstack software and submitted to Defendants Davis and Morderer. The following are screen shots showing the software form and examples of the type of information sales representatives were to obtain from the Medicare beneficiaries.





m.     After gathering this information and submitting the form, sale representatives

were instructed to inform the Medicare beneficiary that a telemedicine doctor would be contacting them soon.

n. On information and belief, Defendants Davis and Morderer would then handle coordination with the patient and the telemedicine doctor.

o. On information and belief, after receiving a prescription from the telemedicine doctor, Defendants Morderer, Davis, and Jackson would sell the Medicare DME referrals (to include the patient information and prescription) to a DME company.

45. On information and belief, Defendants Davis, Morderer, Jackson, and others conspired to perpetuate a scheme in which they generated Medicare DME referrals through the above described process, and did in fact commit acts in furtherance of said scheme, as described herein.

46. On information and belief, Defendants First Due, Quality of Life, and John Doe DME Companies were DME companies that paid Remote Solutions for these referrals.

47. On information and belief, First Due, Quality of Life, and John Doe DME Companies submitted claims resulting from these referrals to Medicare

48. On information and belief, Defendant Jackson ultimately controlled the Remote Solutions call center operation.

49. On information and belief, Defendant Jackson operated other call centers through a similar course of conduct, and other DME companies paid kickbacks to purchase Medicare DME referrals from these centers.

## PAYMENT AND/OR RECEIPT OF PAYMENT FOR DME REFERALS VIOLATES AKS AND FCA

50. Defendants Remote Solutions, Morderer, Davis, and Jackson participated in a

scheme in which they obtained Medicare DME referrals, and, on information and belief, sold them to DME companies.

51.     Defendants Remote Solutions, Morderer, Davis, and Jackson knew or should have known that the DME companies who paid for these referrals would routinely and necessarily file false and fraudulent claims with the federal government when they sought reimbursement for the DME.

52.     On information and belief, Defendants First Due, Quality of Life, and John Doe DME Companies paid kickbacks to Remote Solutions and/or Seth Jackson for these referrals and submitted claims to the federal government based on these referrals.

53.     Both the receipt and payment for these referrals constitute violations of the AKS.

54.     Any claim submitted in violation of the AKS is not eligible for reimbursement by Medicare.

55.     Submission of such a claim for reimbursement constitutes a false or fraudulent claim under the federal False Claims Act, 31 U.S.C. § 3729, and, those who knowingly cause such false or fraudulent claims to be filed are liable under the federal False Claims Act, 31 U.S.C. § 3729.

56.     Defendants knew that claims resulting from kickbacks were not eligible for Medicare reimbursement. Notwithstanding that knowledge, on information and belief, Defendants knowingly undertook such illegal kickback practices through the sale and purchase of DME referrals.

57.     On information and belief, Defendants substantially benefitted from all of the false and fraudulent claims described herein.

58.      Claims that arise from Defendants' kickback scheme are false, and violate the

False Claims Act, because they are the result of a kickback - no further express or implied false statement is required to render such infected or tainted claims false, and none can render the claim legitimate.

59.     Although no express or implied false statement is required, claims infected or tainted by Defendants' illegal kickbacks do contain false statements of compliance with the AKS. In particular, a party that submits a claim for payment to Medicare impliedly certifies compliance with all conditions of payment, i.e., that it is properly payable. As discussed above, a condition of payment of any claim submitted to Medicare is that the claim did not result from a financial transaction that violated the AKS. Consequently, Defendants' kickbacks, either paid or received, render false the submitter's implied or express certification of compliance that resulting claim complies with the requirements of the AKS.

60.     The submission of false claims was not only foreseeable, but an intended result of Defendants' illegal kickback scheme.

## **DEFENDANTS REMOTE SOLUTIONS, MORDERER, DAVIS AND JACKSON'S COVERUP AND RETALITION**

61.     After working for a few months at Remote Solutions, Relator Westover began having concerns regarding the legality of Remote Solutions practices.

62.     Relator Westover began having conversations with her co-workers and Relator Tollison regarding these concerns.

63.     Relator Tollison began researching Remote Solutions and the various other business names it would operate under such as "Infinity Health" and "Priority Health."

64.     In addition to this research, Relators Tollison and Westover had conversations with other employees of Remote Solutions regarding how the business operated.

65.     Both Relators became increasingly concerned regarding the legality of Remote

Solutions and began researching DME referral business.

66.     Through this research, Relators came across news articles regarding the Department of Justice's Operating Brace Yourself. These articles described a DME kickback scheme almost identical to what was occurring at Remote Solutions.

67.     On or about November 12, 2020, Relator Westover confronted Defendant Davis regarding Westover's concern that Remote Solutions was committing similar violations as those in Operation Brace Yourself.

68.     Defendant Davis became angry and shut down the offices of Remote Solutions for one week.

69.     Prior to letting employees leave, Defendants Davis and Morderer took employees' personal phones and deleted text messages and photographs from them.

70.     During the week Remote Solutions was not in operation, employees were not allowed access to their computers.

71.     When employees returned, Defendants Davis and Morderer had deleted files from Relator Westover's work computer and, on information and belief, deleted files from other employees' computers as well.

72.     The only reason provided for being terminated was that Defendant Davis no longer saw a fit for Relator Westover at Remote Solutions.

73.     Defendants Remote Solutions, Morderer, Davis, and Jackson's actions constitute retaliation in violation of 31 U.S.C. § 3730(h) entitling Realtor Westover to certain relief to include "2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees." 31 U.S.C. § 3730(h)(2).

**FOR A FIRST CAUSE OF ACTION**
**FCA VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(A), (B) AND (C)**
**(All Defendants)**

74.     Relators re-allege and incorporate by reference each of the allegations in the preceding paragraphs here.

75.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S. C. § 3729, et seq., as amended.

76.     At all times relevant to this action, Defendants were legally obligated to comply with the AKS and other federal laws governing the marketing and sale of DME.

77.     Defendants Davis, Morderer, Jackson, and Remote Solutions violated 42 U.S.C. § 1320a-7b by receiving remuneration for Medicare DME referrals.

78.     On information and belief, Defendants First Due, Quality of Life, and John Doe DME Companies violated 42 U.S.C. § 1320a-7b by paying remuneration for Medicare DME referrals.

79.     Defendants, by virtue of the acts described above, knowingly caused to be presented, or presented false or fraudulent claims to the United States Government for payment or approval.

80.     By virtue of the acts described above, Defendants knowingly caused to be made or used false records and statements, and omitted material facts, to induce the Government to approve or pay such false and fraudulent claims.

81.     By virtue of the acts described above, Defendants Davis, Morderer, and Jackson conspired to cause to be presented, or present false or fraudulent claims to the United States Government for payment or approval.

82.     By virtue of the acts described above, Defendants Davis, Morderer, and Jackson

conspired to cause to be made or use false records and statements, and omitted material facts to induce the Government to approve or pay such false and fraudulent claims.

83.     Defendants knowingly and willfully violated the AKS with the scheme alleged here.

84.     Defendants' conduct caused patients and healthcare providers to submit claims for the reimbursement of Defendants' products to federal health insurance programs.

85.     Defendants' violations of the AKS are material to patients and healthcare providers receiving reimbursement from federal health insurance programs and federal health insurance programs willingness to pay because, had these federal insurance programs known Defendants' conduct, they would have refused to reimburse these claims.

86.     Defendants' violations of the AKS are also material to Defendant's own receipt of payment since because, had it not engaged in the fraudulent conduct alleged here, it would not have benefitted from the sales that are the product of this kickback scheme.

87.     Defendants' conduct is a violation of 31 U.S.C. § 3729(a)(1)(A), (B) and (C), as amended.

### FOR A SECOND CAUSE OF ACTION
### RETALITAION CLAIM- 31 U.S.C. § 3730(h) *et seq.*
**(As to Relator Westover and Defendants Davis, Morderer, Jackson, and Remote Solutions)**

88.     Relator Westover re-alleges and incorporates by reference each of the allegations in the preceding paragraphs here.

89.     Relator Westover engaged in protected activity when she informed Defendant Davis of her concerns regarding the legality of Remote Solutions' operations.

90.     Defendants Davis, Morderer, Jackson, and Remote Solutions knew about Relator Westover's engagement in protected activity.

91.     Defendants Davis, Morderer, Jackson, and Remote Solutions took an adverse action against Realtor Westover in that she was immediately terminated from employment and data from her phone was deleted.

92.     These adverse actions were a result of Relator Westover raising her concerns regarding the legality of this kickback scheme.

93.     Relator Westover's actions were lawful and intended to stop further illegal conduct by Remote Solutions.

94.     As a result of these violations, Relator Westover is entitled to 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

## **PRAYER**

WHEREFORE, Relator, on behalf of herself and the United States, prays that:

i.     Defendants cease and desist from violating the AKS and the FCA;

ii.     The Court enter judgment against Defendants:

    1.     Awarding an amount equal to three times the damages the United States has suffered because of Defendants' conduct, plus civil penalties as specified by applicable law, for each violation of 31 U.S.C. § 3729;

    2.     Awarding Relators the appropriate bounty pursuant to 31 U.S.C. § 3730; and

    3.     Awarding Relator Westover all applicable relief pursuant to 31 U.S.C. § 3239(h)(2)

    4.     Awarding Relator's attorneys' fees and costs of this action, plus interest, including costs to the United States for its expenses related to this action;

iii.     Defendant disgorges all sums by which it has been unjustly enriched by its illegal conduct;

iv.    The United States and Relator receive all relief, both at law and equity, to

which they may reasonably be entitled; and

v.    That the Court order such further relief as it deems just and proper.

## **REQUEST FOR TRIAL BY JURY**

Relator hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

*s/William Camden Lewis*

**Richardson, Thomas, Haltiwanger,**
**Moore & Lewis, LLC**
William Camden Lewis, Fed Bar No. 12076
1513 Hampton Street
Columbia, South Carolina 29201
(803) 281-8150 | will@richardsonthomas.com

Wesley D. Few, Fed Bar No. 0731
**WESLEY D. FEW, LLC**
Post Office Box 9398
Greenville, South Carolina 29604
(864) 527-5906 | wes@wesleyfew.com

-and

**RYAN L. BEASLEY, ATTORNEY AT LAW, P.A.**
Ryan L. Beasley, Fed Bar No. 09162
416 East North Street, 2nd Floor
Greenville, South Carolina 29601
(864) 679-7777 | rlb@ryanbeasleylaw.com

**Attorneys for Plaintiff / Relator**

February 9, 2021
Columbia, South Carolina